The next case today is American Trucking Associations, Inc. et al. v. Daniel J. McKee et al., Appeal No. 20-2120 and In Re. Daniel J. McKee et al., Appeal No. 20-2168. Attorney Benjamin, please introduce yourself for the record and proceed with your argument. Good morning and may it please the Court. Nicole Benjamin, on behalf of non-parties, former Governor Gina Raimondo, former Speaker of the Rhode Island House of Representatives Nicholas Mattiello, former Representative Stephen Ucci, and the defendants, the Rhode Island Department of Transportation and the Rhode Island Turnpike and Bridge Authority. With the Court's permission, I'd like to reserve two minutes for rebuttal. Good morning and you may. Thank you, Your Honor. The District Court made two important findings that are relevant to this matter. The first is that all of the documents and all of the testimony sought from the non-parties are privileged. And the second is that the Roadworks Act, the challenged statute here, is a facially neutral statute. But notwithstanding those findings, the District Court concluded that the privileges must be breached. The District Court erred in denying the motions to quash eight subpoenas in three ways. First, the District Court erred by concluding that the legislative privilege is a qualified privilege in a dormant commerce clause challenge to a facially neutral statute. Now, if this Court concludes, as it should, that the legislative privilege is absolute in a dormant commerce clause case, it need not reach the remaining claimed errors. If, however, it concludes that the legislative privilege is qualified in a dormant commerce clause case, the District Court further erred by concluding that the subpoenaed evidence is relevant in deciding whether a statute was enacted with a discriminatory purpose under the dormant commerce clause. And lastly, the District Court erred in concluding that state officials' communications with the public opened the door to discovery of all other otherwise privileged communications and documents concerning the Roadworks Act. Now, as to the first issue, the issue of absolute privilege, until now, no court has ever... Ms. Benjamin, may I just interrupt because something you said at the outset prompts this as a matter of jurisdiction. You referred to your former clients because there's a new client in each case. I take it that your new clients, that is, the new governor, the acting governor, the professor, if there is one, to the other representative, all are continuing to take the position that they want to litigate the question of privilege? Is that right? That's correct. That's correct, Your Honor. Then turning to the question of mandamus, why is it that we should be entertaining mandamus here after Mohawk from the Supreme Court? The language there seems pretty clear that if a party is able to litigate that matter and your clients are able to litigate that matter, it can be taken up at a later point. It doesn't justify the exercise of the strong brew of mandamus. There are two issues here. In this case, Your Honor, comes before the court in two jurisdictionally proper ways. First, the non-parties have filed an appeal pursuant to 1291. That appeal is premised on a recognized exception to the final judgment rule for governmental officials who have been aggrieved of a governmental privilege. Separate from that, all of the parties have petitioned this court for a writ of advisory mandamus under the All Writs Act. They have done that in recognition that there is case law that recognizes, and particularly case law from this circuit in the In Re Grand Jury subpoena decision, that recognizes that although typically a party that is aggrieved of a decision related to privilege may be held in contempt and then seek its appellate rights, in the case of governmental officials, there are concerns about requiring a governmental official who has a heightened duty to uphold the law to at the same time be held in contempt and violate the law before being afforded of their right to an appeal. So we've briefed both issues, the appellate issue and the... I understand that. I guess I want to focus specifically on the mandamus at this point. In Re Grand Jury precedes Mohawk Industries, doesn't it? In Re Grand Jury does precede Mohawk. And in Mohawk, the court recognized that it left open the possibility of an immediate appeal for governmental officials. But to address your Honor's question... That would be a separate... I'm sorry to keep interrupting, but that would be a separate issue of whether or not there's a collateral right to appeal on an interlocutory basis. I just want to be sure I've tied this down so that I understand what your position is with respect to that. And this court has never spoken to Mohawk since Mohawk was issued, is that right? That is correct. The only court that has come close to addressing this issue is the 11th Circuit in the In re Hubbard case, which recognized the decision in Mohawk but concluded that it did not tie its hands with respect to the assertion of a governmental privilege. But to address... Isn't the case that the Second Circuit addressed it as well in Rosner and did so in May of last year? That is correct, your Honor, but not with respect to the specific issues that are here. And to answer your Honor's question about the petition for writ of advisory mandamus and the standard for that, what we have argued in our papers is that these are unsettled questions of public importance. Is that the standard for supervisory mandamus, that whenever there's an unsettled issue that the court should issue a mandamus order? I mean, that mandamus is a pretty, as I said, strong brew. I wonder whether it's a roving writ to inquire into interesting public policy issues. Let me be clear about the mandamus that we are seeking. We are not seeking a writ of supervisory mandamus. And I agree with your Honor that that is a more challenging standard. What we are seeking here is a writ of advisory mandamus, which is the writ that was addressed by the court in the In Re Grand Jury subpoena case. And the standard for issuance of a writ of advisory mandamus requires three findings. One is that the issue is one that is unsettled and is of substantial public importance, that the issue is likely to recur, and that deferral of review would impair the opportunity for effective review. And it's on that last prong that we tie back to the issues we were addressing earlier about the concerns about governmental officials coming forward and violating a court order to be afforded their, either appellate right or here, a right to mandamus relief. So for those reasons, we have brought this case before this court in two jurisdictionally proper ways, both through the appeal and the petition for a writ of advisory mandamus. And with respect to the merits on the absolute privilege, until now, no court has ever held that the legislative- But back to the last effective review component. Yes. If these parties were forced to comply with the discovery order, and it turned out later, as in Mohawk, to be wrong, why wouldn't, on retrial, the evidence simply would not be admissible? There are two issues, Your Honor, that I believe cannot be cured. One is that the privilege is being lost forever once the disclosure of the documents and the testimony occurs. And second, that the whole purpose behind the legislative privilege is to prevent intrusion into the legislative process. And if the discovery was permitted- Isn't there a mechanism for testing that? That is to say, someone can go and contempt the party that is being required to produce something, and that's the CDM, can decide to go into contempt. Or not. They choose not to, if they want to. But there is an opportunity to test it at the early stage. If they don't do it at the early stage, then it's evaluated after there's an analysis of whether or not the documents are admissible, ultimately admissible. We're really talking about the discovery stage right now. We are talking about the discovery stage, but that is precisely the unseemly result that this court, in Ray Grandjury's subpoena, was concerned about. The unseemly result of requiring someone in the position of, here, the governor or the Speaker of the House of Representatives to violate a court order to be afforded their appellate rights. Well, it's not really the governor who's doing that, it's the CDM. That is, CDM says, it's the same circumstance in which a lawyer says, I'm not going to assert the privilege, and it goes forward on that basis. It's not a matter that the court raised at that point. So CDM Smith is one of the parties to two of the subpoenas. The other subpoenas were served on the state officials who have filed the appeal and the petition for writ of mandamus. The issues that run across all eight subpoenas are identical. So if the court were to take up the issue of the propriety of the court's decision regarding the state officials, the decision there would be equally applicable to the issues that are at stake with respect to the CDM Smith subpoenas. But with respect to the absolute privilege, until now, no court has ever held, other than this district court, that the legislative privilege is a qualified privilege in a dormant Commerce Clause case. And in fact, the only other district court to directly address this issue is a district court from this circuit, it's the District of New Hampshire, in the Miles Unlimited case, which was a dormant Commerce Clause case, and the court said that the legislative privilege there was an absolute privilege. Now, I'm sorry to keep interrupting, but I do want to frame this a bit. I'm not sure I find that helpful, labels like absolute and qualified. And so maybe I'd step back this way to ask a hypothetical question, again, one that I hope you won't fight, so that we can get to the core of this. But let's assume this, that there is a regulation law like the one that you have, that makes it more difficult for out of state, not more difficult, more expensive for out of state truckers to come by with more than just one rig attached. And let's assume that there's only one way to transport certain kinds of fish products from the South that are only generally done by Vietnamese refugees from, say, Louisiana. And let's assume that the governor and the Speaker of the House say, the reason that we want to impose this extra burden is that we're tired of having people from Southeast Asia come through our space, and we're going to make it more difficult for them to do that and to do business in this space. That's what they say. Just assume that that's what they say. Putting to one side these labelings between qualified and absolute, wouldn't the Dormant Commerce Clause work under those circumstances as well? It would work for questions of race, of course, but wouldn't it also work for Dormant Commerce Clause? So, under the Dormant Commerce Clause, the legislative privilege still in that circumstance would be an absolute privilege, and the reason for that is because the courts have drawn a distinction between cases that are civil cases brought by private parties to vindicate private rights, and in those circumstances the courts have said the privilege is absolute. And those cases where the court has said the privilege is qualified are federal criminal prosecutions, and also those cases where there are important federal interests that cause comedy to yield. So in addressing that second question, whether important federal interests cause comedy to yield, the courts have said that not every constitutional claim is sufficiently important to cause comedy to yield, and not every case that involves a claim of discriminatory purpose is sufficiently, has a sufficiently important federal interest that cause comedy to yield. Rather, the courts look to the claim itself, and we've pointed the court to examples of redistricting and voting rights cases, and those cases the courts have concluded present important federal interests, and they've reached that conclusion for three reasons. One, those are the types of cases that the Department of Justice has enforcement authority over, so Congress has already made the determination that those cases present sufficiently important federal interests. But what about here, where the governor goes and talks to the press, and the press then quotes the governor, but the governor then won't admit that the governor said what the press said she said. What's wrong with pinning down whether the governor said that or not by asking the governor, what did you say to that reporter? Well, there are several things that are wrong with that, the first of which is that in a dormant Commerce Clause case, that type of evidence is not the evidence that the court considers, because the court considers what the intent of the legislature as a whole was in enacting that. Let's say I disagree with you on that. If the key proponent of legislation publicly speaks on the purpose of the legislation, why shouldn't there be a way for bringing that information before the court? For several reasons, one, by the governor speaking to the public, the governor has not waived the privilege, particularly as to other members of the legislature. Let's stay with the governor. Why isn't it a plain waiver for the governor? As to the statement that the governor made, we have not maintained that that statement is something that is protected by privilege, but to the extent that the plaintiffs are looking to get underneath that and seek other documents and information, that would be tantamount to a conclusion of a subject matter waiver. Let me understand then, so they can ask, it's all right with you if they just ask the governor, what was it you said to the reporter? I wouldn't go as far as to say it is all right to ask the governor because the privilege does protect the governor from being deposed, but we have not maintained that the statement itself is protected by privilege. What we have said is that inquiring about the context, for example, of that statement is protected by privilege. I think you're doing more than that. You're saying it shouldn't be admitted into evidence because it's hearsay. We have made that argument. That is not an issue that is currently before the court, but that is an argument that has been made to the district court. So you're saying one, it's hearsay, so it can't come in, but two, you can't ask the governor directly, so you never get it in. That seems a little nifty. The rationale for that, though, is that this court and many other courts have looked at what can be considered when deciding the issue of discriminatory purpose and have said that we look to the statute as a whole, we look to statutory context, and we look to legislative history. Let me ask you this. We have a facially neutral statute, but we have at least a plausible allegation that the effects of that statute are at least in one significant respect discriminatory against out-of-state trailers. So there we have that. So the governor and the legislature would only know if it was that those were the effects based on what the outside consultant told them. I doubt the governor or the legislature would sit down and do all the math. So why don't we want to put into evidence what it was that I think it's CDM told the would be the effect? Because if they did know it, then you've got a decent argument on purpose if you're the plaintiffs. But if they didn't know it, you've got a pretty good argument on lack of purpose for the defendants. CDM Smith's reports and the other reports of consultants, the final reports have been made available both to the public and to the plaintiffs here. What the plaintiffs are seeking are the communications underlying those final reports. It's all of the lead up and the analysis that goes into reaching some of those conclusions. That's where you'd find out if they were, look, if you looked at all the CDM stuff and you've got an original report or original estimate, and then you've got someone saying we want to shift that to the out-of-state commerce more, how do you do that? And they say, here's how you do it, and then here's their final report. It seems that those interim reports and those conversations leading up to that with CDM to and from CDM alone would be pretty relevant. What I think is important is what the United States Supreme Court has said most recently on the dormant commerce clause. And what it said in the Winn case is that the commerce clause regulates effects, not motives, and it does not require courts to inquire into either voters or legislators' reasons for enacting a law that might have a discriminatory effect. So let me make sure I understand that correctly. You're saying if the plaintiffs prove a discriminatory effect, they win. They don't need to prove any purpose. That's correct, Your Honor. In this court, in the Alliance of Automobile Manufacturers case referenced in a footnote that there had been a question in the law about whether discriminatory purpose standing alone would be sufficient to make out a dormant commerce clause case, the Supreme Court answers that question in the Comptroller v. Winn decision from 2015, where it says that the commerce clause regulates effects, not motives. Now, I understand that I am out of time. I'm happy to answer any further questions. Thank you. Thank you. Thank you, Attorney Benjamin. You can mute your audio and your video at this time. Attorney Rothfeld, if you could unmute your device, audio and video, and introduce yourself on the record, please. Thank you. I'm Charles Rothfeld, Mayor Brown, representing the Plaintiffs Appellees in this case. Good morning, Your Honors. I'll start with a point that was raised by Judge Piatto, which I think goes to one of the key unusual features of this case and really illustrates why the legislative privilege should not be absolute. One of the things that happened in this case is that the governor of Rhode Island and various about their intent in proposing and enacting the roadworks legislation, which is an issue here. They said in so many words that they proposed the structure of the roadworks tolls because they wanted to impose disproportionate burdens on interstate truckers and basically export some of Rhode Island's tolling burden across state lines in a way which we think is clearly inconsistent with the Dormant Commerce Clause. Counselor, if that's factually true, if you have experts who say that that's factually true, and you just heard your sister counselor's interpretation of Comptroller v. Winn, why do you even need anything else? Well, I have to respectfully disagree with Ms. Benjamin's reading of the Winn case. This is an issue that's been briefed extensively before the district court. We didn't brief it before this court because we didn't think it was really directly relevant, but the state has acknowledged and acknowledges in its brief to this court that intent goes into making out a Dormant Commerce Clause claim. We certainly agreed that if we established a discriminatory impact, that could be enough by itself to establish a violation of the Constitution, but we also think it's very clear from this court's decisions in the automobile manufacturer's case and in the BACA's case that discriminatory intent also establishes a Dormant Commerce Clause violation. Stay with that because I'm having real trouble understanding that. In other words, the proposition is legislation has passed. It has no discriminatory effect on interstate commerce. Who then cares what the purpose is? You could have every legislature saying they were trying to affect interstate commerce, but they missed. So there's no Commerce Clause violation. I will answer that question, Your Honor, but if I can just explain that even if that were true, we think that evidence of discriminatory intent would be highly relevant to us here because I think... But who cares if there is no discriminatory impact? Who cares why legislators do what they do? It's like making sausage. Who cares if it doesn't really have a negative impact? Well, I guess two responses to that, Your Honor. One is the presumption is that legislation tends to accomplish what it's designed to do and so establishing that there was a discriminatory intent in devising the statutory structure as it was enacted strongly suggests that in fact it did have a discriminatory impact and so we think that intent and effect sort of go together in that sense. I guess I would also say just in terms of discriminatory intent standing alone, the legislature can adopt statutes for a variety of reasons that have a burden on interstate commerce, whether or not that's a discriminatory burden. I think A, the intent reveals that, B, the fact that a particular structure was chosen for the purpose of discriminating against interstate commerce I think does establish that there is a Commerce Clause violation. If there's no effect, how could you possibly have a Commerce Clause violation if there's no discriminatory effect of any type on interstate commerce? Well, clearly there isn't an impact on interstate commerce here and so the question would be why did the state adopt it? Do you have an expert who says that? I'm sorry, Your Honor? Do you have an expert who says that? We certainly will have experts who testify to the discriminatory impact of the Roadworks tolls and I think, you know, for present purposes, I think... Wait a minute. Do you have an expert who says that, not whether you have someone down the road who you think might testify to that? I mean, have you had this put before an expert to opine as to whether there's a discriminatory impact on interstate commerce? Well, Your Honor, we're still at the discovery stage at this point so we haven't introduced factual evidence on those points. When we get... Do you have the report? We will. We are in the process of putting that material together. Well, you moved for a preliminary injunction so you clearly have been looking at the merits of the case. No, absolutely, Your Honor, and in fact, we thought that the C.D.M. Smith study, which the court has been referring to, is sufficient in itself to demonstrate a discriminatory  Here's what puzzles me. Here's what puzzles me. I want to interrupt a little bit to focus on the questions that Judge Thompson was raising and you were responding. That is, for present purposes and we are in discovery. Isn't the real thrust of Gwodowski and family winemakers that for purposes of testing a question of privilege, whether or not there's a sufficient critical mass to justify intrusion into the legislative history, you've got to have something that shows intent or should and something that shows effect or you should and you need both of them before you can go forward on this. Now, if that's the case, then there is some relevance to asking questions about intent and it may be informing the judge who makes the determination at the discovery stage, but it really is a fact that we're talking about ultimately and that's where I think I have a little bit of a problem, which is to say, yes, there is a disparity for out of state truckers, which is used more or less as people with big rigs as a proxy. I'm not sure that there's established just on its face from the CDM study that there on interstate, that is to say, they do a lot more damage on the roads when they've got big rigs and you might expect them to pay more for passing through the state as opposed to short hauls by people with a single rig. I'm not sure you've even gotten to that point of showing that there's a discriminatory effect on this. Let me give you two answers to that, Your Honor. On that particular point, the CDM-Smith study, the study found that as between large trucks, that the roadworks tolls have been structured in such a way to impose a disproportionate burden on the out of state truckers who operate large trucks as opposed to the in-state truckers. I think on the face of it, the CDM-Smith study... That's a use rate related question, that is who's causing more damage, more wear and tear on the roads and big trucks are posing more wear and tear on the roads than short haul. I think that the question is in travel that is conducted in Rhode Island, whether or not a disproportionate share of the toll is being imposed on the out of state truckers as opposed to the in-state truckers. We think that the CDM-Smith study demonstrates that that is taking place. That's going directly to Judge Thompson's question. Do you have an expert yet? You say you're working on the expert, but the problem is that there's... Not problem, but it appears that there's going to be a need for something that takes it beyond mere arithmetic to show impact because it can be read a variety of different ways. Ultimately, Your Honor, it is our burden to establish that there was a discriminatory impact and we believe a discriminatory intent and we will do that. We have expert reports are now being compiled. There's a schedule that Judge Smith established in the district court, a discovery schedule, and we will satisfy that and submit reports that we think are going to be very probative on that point. But that goes to the question of whether or not you've got a likelihood of success on the basis of the record that you presented to the district court. That's what we're evaluating, whether there's a likelihood of success on the basis of what was actually presented to the district court. That goes back to the question or the issue of you think you're going to have it in the future and perhaps you will, but you don't have it now. That's because, Your Honor, we're not at that point in the district court to establish our case on the merits. On the discovery question, which is now before this court, which is essentially whether or not the legislative privilege is absolute or qualified, Judge Smith did make a pretty clear determination on that. He went through the factual circumstances of this case and he found that the discovery materials that we're seeking from former Governor Raimondo and the former members of the General Assembly are both, A, directly relevant to our claims and that, B, we have satisfied the qualified legislative privilege test that courts generally apply across the country. He found that we are not, and I think this is responsive to your question, Judge Whitlock, we are not engaging in a fishing expedition here. The public statements that were made by these government officials about their intent to discriminate against interstate commerce, and again, intent I think is relevant both by itself and because it demonstrates the discriminatory impact that this legislation has. It's those statements. We're back to the question that this is simply a discovery dispute. This is simply a question of predicates for waiving the privilege or breaching, I guess, is the term that Judge Smith used. I think that's right. At this point in the case and the issue that is now before this court specifically is limited to the discovery question and we believe that Judge Smith was absolutely correct, both in finding that the legislative privilege is qualified and is not absolute. That's what the U.S. Supreme Court held in the Gillock case. We think that's what every federal court of appeals to address the question has determined. That's what dozens of district courts across the country have held. Under the five-part balancing test, a sensitive, nuanced test that the courts apply to determine whether or not important state interests will be frustrated by breaching the privilege in the circumstance of that case, Judge Smith carefully applied that standard here and found that the state interests were not significant, did not be materially adversely affected by breaching the privilege and that there was a key need for the evidence that we are seeking to obtain from these state officials here. Can you speak to the question of whether or not you're seeking something broader than simply what is affecting the defendants in this case? That is to say, are you entitled to everything that this breach, if that's what it is, covers everything that the legislature had before it or anybody in the legislature had before it or does it just simply affect the speaker and the governor? Are you entitled to depose every single member who voted for it? We have never suggested that, Your Honor. As Judge Smith... Would you be? I mean, how broadly is the remedy that you're seeking? I don't see why it wouldn't be applicable to everyone who voted. This is a decision of the General Assembly. Well, a couple of points in response to that, Your Honor. First of all, the standard that we think applies and that Judge Smith applied, this five-part test, puts a pretty heavy thumb on the scales against disclosure. I mean, everybody recognizes, Judge Smith found, that it's only in the extraordinary case that the privilege is going to be breached and we have to make a showing as to why, as we want to question and as to the evidence that they have in their possession, why that is likely to be relevant. The officials here are the ones who had the key role in proposing, designing, and enacting the roadworks legislation. Governor Raimondo's administration devised the program, drafted the statutory language, had a key role in shepherding that legislation through the General Assembly. The two legislators that we are talking about here had key roles in getting that legislation enacted, the speaker of the General Assembly, one of the sponsors of the legislation, and so they have, I think, a particularly important perspective on the meaning of the legislation and that's why we have chosen to seek to dispose of them and to get their information. We do not think that every member of the General Assembly who voted on behalf of the legislation could be as useful, as effective, could have information that is as directly relevant as those key members, the governor who devised the legislation. There's a larger question that's raised by Judge Thompson and that is whether or not you think you want to spend your time asking every legislator what they believe or don't believe. You're not really entitled to anything more than the persons who actually waive that privilege by public assertion, are you? We don't suggest that they waive the privilege. We think that it's clearly appropriate to breach the privilege in the circumstances here and the fact that they spoke publicly about their intent, their intent to discriminate, we say that's interesting. If you look, for instance, at Bethune and Belsenek, those were cases in which there was structured a discovery inquiry to see whether or not people who had not said anything publicly were prepared to waive their privilege and most of them were not, and so they weren't permitted to inquire of them. You're holding open the possibility that you might if you think it's useful to you. I think, Your Honor, that if we were to do that, we would have to make a showing as to why satisfying the pretty discriminating standard that the courts apply to determine whether the privilege should be breached, we would have to demonstrate that as to each member of the General Assembly. We are not suggesting that we're going to move beyond the officials that we're talking about now. These officials chose to spoke publicly about their intent to discriminate. They had key roles in enacting this legislation, in devising and enacting the legislation, and therefore, it's clearly both highly relevant and appropriate for us to be talking to them. Why, if you were to get all of CDM's files, it seems improbable that there would be anything else that would shed much more light on what you are looking for. Certainly, the CDM Smith files would be very helpful and revealing. We do think that getting the information directly from, if we're talking about the intent of the state officials, getting that information directly from them is the most probative and compelling way of establishing what they actually intended to do. How is that going to be? Once you have the CDM files, you'll know what the state officials knew or didn't know. You'll know the math. You'll know whatever was run. Other than conclusory bottom lines, yes, my purpose was this, or no, my purpose was that, how are you going to likely find anything else that's not in the CDM files? It may well be that there are intra-governmental communications saying that we would like to modify the legislation in this way or that way because that will have the effect of further imposing a disproportionate burden on out-of-state entities. How would they know that unless CDM explained to them? How would a government official know that? They would have from the CDM Smith materials the likely effect of changing the legislation one way or the other. Then you'd know what they picked. Their explanation as to why they picked particular methods and did not pick others I think could very well be revealing. As the Supreme Court has suggested in cases like the Cooper v. Harris, it has to be known to the defendants in this case. That is to say these inter-governmental communications would have had to have been known to these defendants rather than some general understanding within the government. Isn't that a limitation? That's absolutely right. Again, Your Honor, we are not asking for a blanket disclosure of all materials in the General Assembly. We are focusing specifically on the key players in the enactment of this legislation who spoke publicly about their intent regarding the legislation and whose intent is going to we think would be directly relevant to establishing the Government Commerce Clause violation in this case. Can I give you a chance to talk about the question of pressing the mandamus issue as a jurisdictional issue before us and to understand what you think is going to happen under these circumstances? That is to say, is it your position that CDM is not going to appeal, is not properly able to appeal, and that under the circumstances, the only way for them to raise the issue is by going into contempt? Is that the position that you are taking? I'm a little bit unclear about where the parties are on this. Yes, let me try to clarify that, Your Honor. On the appeal, our view, we filed a motion to dismiss the appeal for lack of jurisdiction because we believe that they were obligated to go into contempt in order to take an appeal. On the mandamus question, my understanding, and I should have clarified this at the outset, I believe that the Mohawk Industries case actually predated this Court's decision, most recent decision in the grand jury advisory mandamus issue. We have briefed and addressed the advisory mandamus question in terms of the grand jury decision. We understand that the standard to be, sort of the key standard to be whether or not the law is unsettled, and so with that understanding, we have briefed the question of whether or not entitlement to legislative privilege is absolute or qualified and whether or not that's settled or not. We think it's quite clearly settled that it is qualified and not absolute, and I think an appropriate way for the Court to resolve the mandamus question, therefore, would be to resolve it by saying that, in fact, the issue is not unsettled. It is settled in the sense that the legislative privilege is qualified and to reject the State's claim for that reason. What if we were to say qualified and absolute is not very helpful? We're really looking at the question of whether or not this is one of those constitutional rights that is of public significance, and certainly that's the case with voting rights. Perhaps it's the case here under certain circumstances with Congress clause. We're not really talking about labels so much as whether under these circumstances it can be reached to get this kind of information. I'm not sure that it's unsettled. We agree with that completely, Your Honor, and I would say that where there are important federal constitutional rights, including the Equal Protection Clause and the Commerce Clause, where the intent of the State actor is part and element of the cause of action, those are important federal interests of the sort that the Supreme Court decided and described in the Gillock case, and that State privilege has to yield in the face of the assertion of those rights. We think it's clear that if the State's rule, whether we call it absolute privilege or something else, and I agree, Judge Woodlock, that labels are not important, but if the State's claim that such information is categorically unavailable, that will often make it impossible to enforce the Equal Protection Clause, to enforce the Commerce Clause, to enforce federal constitutional claims in which the intent of the legislature is key to establishing the element to the and whether it's in a voting rights case, a gerrymandering case, a Dormant Commerce Clause case, other form of Equal Protection case, such as the Supreme Court's Arlington Heights decision involving racially discriminatory exclusionary zoning, that breaching the privilege is appropriate on a showing that it's relevant and that the information is necessary. We think that that is appropriate and the courts generally agree on it. I know you're on, my time has expired. Yes, any other questions? Okay, thank you. Great, thank you so much, Ron. Thank you, Attorney Rothfeld. At this time, if you would please mute your audio and your video, and Attorney Benjamin, if you could unmute and reintroduce yourself on the record. Nicole Benjamin on behalf of the appellants and the petitioners again, I'd like to come back to the issue of the reach of the ruling that is being requested from the court, and that issue ties back to the Fourth Circuit's decision in South Carolina v. Campbell. The Fourth Circuit concluded that it was reversible error to permit the testimony of 16 members of the legislature, only 16 members, when there was 169 members of that legislature on their intentions in passing a particular statute. And what the court said there is it is manifestly impossible to determine with certainty the utterances of individual members thereof, even statements made by sponsors and authors of the act. So here, where it is being asserted that we're only seeking information related to the, that the plaintiffs are only seeking information related to the sponsors of the act or the proponents of the act, you know, the Fourth Circuit rejected that proposition. Well, but that was, if I may, Ms. Benjamin, that's on the assumption that the testimony would be categorically the proxy for the entire legislature, and that doesn't appear to be the suggestion here. The suggestion here is that it is some evidence, not dispositive evidence, but some evidence having to go to intent which may inform the question of effect. And so what we're starting at a relatively small, or at least I am, at a relatively small level. We've got three defendants here, three named defendants, and then we've got somebody who has some background information that may or may not have been available to them. So we're not talking about that wholesale kind of, we pick out two legislators and say they are the legislation. So I respectfully disagree that this is the type of evidence that may be considered in deciding discriminatory purpose, but even if the court were to conclude that it was, the question becomes, is this the sort of evidence that is sufficient to cast aside a long-settled legislative privilege? And the court in the government suppliers versus Baja case, this was the Southern District of Indiana, considered a similar question. That was a dormant commerce clause case, and it was alleged that the evidence that was being sought from the governmental officials there was necessary to the prosecution of the claim. There, however, the court said that it would not breach, in that case, what was the deliberative process privilege that was being alleged under the same five-factor balancing test that the court is considering here. And there the court said, despite the occasional Supreme Court reference to motive in a dormant commerce clause case, no opinion has yet held that such evidence is relevant, let alone dispositive. So the court said it was not enough to cause it to set aside what otherwise would be a well-founded legislative privilege, or there, in that case, the deliberative process privilege. And the last point I'd like to come back to is the point that Judge Chiodo made in terms of the importance of motive versus effects. And we did not cite this case in our papers, but because it comes up in response to this question, it is on remand, the Comptroller v. Winn case, on remand, the district, this is the Maryland Court of Appeals, in June of 2020, the citation is 469, Maryland 62. And the court, just like the observation that Judge Chiodo made this morning, said it is difficult to conceive of a truly separate category of purposeful discrimination that doesn't fit into the categories of facial discrimination or discrimination in effect. It is difficult to imagine a case in which a state legislature intended to discriminate against interstate commerce, but either didn't make that clear in the statute itself or failed to achieve that purpose and didn't discriminate in effect. So for those reasons, we respectfully request that the court reverse the district court's rulings with instructions to quash the eight subpoenas at issue. Thank you, Counselor. Thank you. That concludes the arguments in this case. Attorney Benjamin and Attorney Rothfeld may disconnect from the meeting at this time.